UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>WESLEE WILKINSON,<br><br>　　　　　　*Defendant*. | Crim. No. 25-mj-228 (ZMF) |

**DEFENDANT'S OPPOSITION TO GOVERNMENT'S MOTION
FOR EMERGENCY REVIEW OF RELEASE ORDER**

Defendant Weslee Wilkinson, through undersigned counsel, respectfully submits this Opposition to the Government's Motion for Emergency Review of the Release Order entered by Magistrate Judge Zia M. Faruqui.

**INTRODUCTION**

Defendant Weslee Wilkinson, 23, is a devoted father, a lifelong resident of the District of Columbia, and community volunteer with no history of violence. He poses no danger to the community and no risk of flight. The government's emergency motion offers a distorted narrative that ignores the facts already considered by Magistrate Judge Zia M. Faruqui, who correctly found that strict release conditions—including home incarceration and family supervision—adequately ensure both community safety and the defendant's appearance. The record demonstrates that Weslee's offense—possessing a firearm—was nonviolent and defensive, his family and community ties are extraordinarily strong, and his prior conviction for possession of a firearm was likewise defensive and indeed likely saved numerous lives. The government's arguments to the contrary should (again) be rejected.

**LEGAL STANDARDS**

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). In passing the Bail Reform Act, 18 U.S.C. § 3142, Congress limited pretrial detention to a "small but identifiable group of particularly dangerous defendants," S. Rep. No. 98–225, at 6 (1984), charged with "the most serious" crimes, *Salerno*, 481 U.S. at 747. Under § 3142(g), courts must consider four factors for this determination: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community posed by release. Pretrial detention is permissible *only* when the government demonstrates that *no* combination of conditions will reasonably assure the defendant's appearance or, by clear and convincing evidence, the safety of the community. *United States v. Hanson*, 613 F.Supp. 2d 85, 88 (D.D.C. 2009).

**ARGUMENT**

**I.   History and Characteristics of the Defendant**

Weslee Wilkinson's life story, as detailed in numerous letters of support, shows a young man who has assumed responsibility and leadership for his family in a harsh environment without resorting to violence or criminal enterprises. Weslee has deep community roots, having lived in the same apartment with his family on Benning Road his entire life. All of his immediate family reside locally. While caring for his son and stepson, Weslee regularly takes day-labor jobs to support his household, which includes his fiancé, stepson, infant son, mother, and brother. His willingness to work reflects responsibility and commitment to lawful means of providing for his family. His mother also works as a contractor with the D.C. Jail, exemplifying the family's sense of responsibility and lawfulness.

At just 23, Mr. Wilkinson is the main caretaker for his stepson and two-month-old son, Wisdom. His fiancée, DeQuirah Darmen, writes that "he makes sure everyone is physically and mentally taken care of" and that their baby "cannot sleep without his dad at home." Ex. 1 at 4. She describes him as "a father figure to everyone, not just the kids" who "takes care of the whole household"—the emotional core of his nuclear and extended family. *Id*.




*Weslee with his fiancée, son, and stepson*

Weslee grew up under hard circumstances, being raised by a single mother in D.C.'s Benning Road neighborhood. But he connected with community leaders early in life and strove even at his young age to make a positive difference in the youth of his neighborhood. Former ANC Commissioner Ebbon A. Allen, who has known Weslee for over a decade, writes glowingly of his involvement in the community:

3

> Ever since I met Wes, the journey of talking to this young man has been phenomenal. . . .Wesley would participate with my youth rallies. Wes would come with me to CW Harris ES to speak and talk the 2nd and 3rd graders about growing up in Southeast, DC. Wes would also be very resourceful when I hosted my Public Safety Days within the Benning Park Community. I am very proud of Wesley because this young man has bounced back every time he lost his friends to gun violence. Wes would talk to me about aspiring to graduate from HD Woodson. Wes also wanted to find a job so he could help his mother with all of the bills in the house.

*Id.* at 1.

Family is central to Weslee. His sister describes how, after their father's death, he became "like the dad of the family." *Id.* at 6. Since his mother frequently works a night shift, Weslee makes sure his younger brother, Keshard, is "up on time for school" and "eats and gets his homework done." *Id.* His younger brother, Keshard, adds that Weslee "is the best brother I could ask for." *Id.* at 8. He writes that "ever since my father passed, he took care of me like our father" and "taught me everything I know to do like how to cook, clean, write, and to play basketball." *Id.* He adds, "He is everything to me, I really don't know what I do with out him." *Id.* His aunt, Monica Jordan, writes of his "kind, polite, and thoughtful" nature, urging the Court to allow him to return home to support his family. *Id.* at 9. Even his neighbor, Jerome Smith, took the time to "share my personal experience of knowing him and to speak on his character." *Id.* at 3. And what he has observed of Weslee is outstanding:

> I have known Wesley for some time, and I can confidently say he is a good man, a devoted friend, and a caring father. Wesley has always been there when I needed support. He goes out of his way to help others without hesitation, showing kindness and reliability in every situation. He treats people with respect and carries himself with honesty and responsibility.
>
> As a new father, Wesley is fully dedicated to his child. He takes his role seriously and provides love, guidance, and stability. I have seen how hard he works to create a positive and safe environment for his family. His actions show that he wants to set the best example for his child and be the kind of father every child deserves.

4

> In my experience, Wesley is a dependable, hardworking, and trustworthy individual. I truly believe he adds value to his family, friends, and community.

*Id.* These are not the words of a family rallying around a dangerous man; they are heartfelt accounts of an incredible young man striving to be his family's foundation in extremely hard circumstances.

Against this compelling record of responsibility, mentoring, and community involvement, the government only offers Weslee's prior conviction, calling it a "dangerous use of a firearm in a crowded space." Mot. at 5. But as even the government acknowledges, Weslee's prior use of a firearm was in *defense* of his neighbors and family. At the time of the incident, there was a peaceful cookout in Weslee's neighborhood attended by over 100 people. Ex. 2. Three unknown assailants drove up to the cookout, got out, and began firing into the crowd. *Id.* In response to this assault, Weslee, just 18, ran inside, retrieved a firearm, and fired at the assailants to protect his family and community, including women, children, and elderly residents. *Id.* In the shootout, over *80 rounds* were unleashed and found at the crime scene, while Weslee only fired *two* rounds back. *Id.*

The government asserts that this brave act of defending his community "ultimately risked their safety and wellbeing." *Id.* But it is the assailants, not Weslee, who put the lives of his neighbors in danger; the crowd surely would not have been safer had the assailants been allowed to continue to fire unchecked into the crowd, as they were doing the whole time he ran up to retrieve the weapon. And while the government faults Weslee for his "prior decision to acquire the firearm and ammunition for that gun, load it, and keep it readily available," Mot. at 6, the need for such personal protection was clear from the incident itself. The only problem was that Weslee did not have a *license* to carry the firearm at the time: at just 18, he was not old enough to legally obtain a license.

5

District laws thus put Weslee—a legal adult desiring to protect himself, his family, and his community—in the untenable position of having no legal way to possess the very firearm he used to protect his family and neighbors that day. Because Weslee was too young to apply for a firearm license in 2020 (but not too young to get shot), his gun possession resulted in him becoming a felon. That is his *only* prior conviction. But it is hardly the measure of this man. Given these circumstances, the neighborhood he lives in, his efforts to support his family, raise his son, and influence youth in the community, Weslee has demonstrated that he is an asset to the community, not a danger to it. This factor favors release.

## II.     Nature and Circumstances of the Offense

Weslee is charged with felon in possession under 18 U.S.C. § 922(g). A loaded firearm was found on his person after he was pulled over while driving with his sister due to a non-working light. He was polite and cooperative with officers. The weapon was never brandished, displayed, or used in connection with drugs, threats, or violence. His conduct amounts to passive possession discovered during a stop, not active criminal use. While firearm possession is serious, there was no violent act, drug trafficking, or threatening conduct accompanying the charge; and possessing a firearm for personal protection in a dangerous neighborhood is somewhat understandable. The overall nonviolent nature of the offense thus ultimately supports the "norm" of pretrial release. *Salerno*, 481 U.S. at 755.

Arguing otherwise, the government asserts that the charged offense—possession of a firearm by a felon—presents "an inherent risk of danger to the community." Mot. at 4 (citing *United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at *7 (D.D.C. Feb. 6, 2023)). But numerous courts in this circuit and elsewhere have ruled otherwise. As the D.C. Circuit explained in its seminal treatment of this question, "While felons with guns may as a class be more

6

likely than non-felons with guns or felons without guns to commit violent acts, nothing inherent in a § 922(g) offense creates a 'substantial risk' of violence warranting pretrial detention." *United States v. Singleton*, 182 F.3d 7, 14–15 (D.C. Cir. 1999) (quoting 18 U.S.C. § 3156(a)(4)(B)); *see also United States v. Doe,* 960 F.2d 221, 224–25 (1st Cir. 1992) (Breyer, C.J.) ("[S]imple possession, even by a felon, takes place in a variety of ways (e.g., in a closet, in a storeroom, in a car, in a pocket) many, perhaps most, of which do not involve likely accompanying violence.").

Rather than the "inherent" fact of possession itself, it is the dangerousness of the individual or the prior felony that makes the subsequent possession of a firearm dangerous. As the *Singleton* court explained, "a person convicted of a non-violent crime does not become a candidate for pretrial detention merely by subsequently possessing a firearm, as such a person does not seem especially more likely to use the firearm in a violent manner. The distinction between violent and non-violent felonies is therefore meaningful in the [bond] context. . . ." 182 F.3d at 15. In other words, where the prior felony was nonviolent, there is no indication the now-felon is any more inherently dangerous to the community or would inherently use a firearm violently. *See United States v. Cope*, 452 F. App'x 114, 117 (3d Cir. 2011) ("Mere possession of a firearm by a convicted felon does not permit an inference s/he will use the weapon . . . . [But] [g]iven [the defendant's] long history of violent felonies, . . . there is an increased risk of violence when someone with [his] criminal history possesses a firearm."). Thus, in cases where detention has been ordered in 922(g) cases, it has almost always involved additional factors like evidence of drug sales or current or prior violence. *See, e.g.*, *United States v. Taylor*, 289 F.Supp.3d 55, 71 (D.D.C. 2018) ("[A]lthough the mere fact that the defendant possessed a firearm does not constitute evidence of a danger to the community, possession of a firearm by a convicted felon who is allegedly engaged in illegal drug

7

distribution is a different matter."); *United States v. Wills*, 311 F. Supp. 3d 144, 148 (D.D.C. 2018) (quoting *Taylor*'s distinction and noting that the defendant "engaged in a drug trafficking offense while carrying a loaded firearm"); *United States v. Samuels*, No. 18-CR-144 (RC/GMH), 2018 WL 2304787, at *4 (D.D.C. May 21, 2018) (quoting *Taylor*'s distinction and noting the combination of drugs and firearms); *United States v. Anderson*, 177 F. Supp. 3d 458, 463 (D.D.C. 2016) (citing *Singleton* for the principle that "mere possession of a firearm by a felon does not create a substantial risk," but ordering detention because "here the charge is not one of simple possession by a felon" but "possessing a firearm during the commission of a crime of violence"); *United States v. Bryant*, 500 F. Supp. 3d 1172, 1175 (E.D. Wash. 2020) ("Mr. Bryant does not pose a danger to the community…His current offense is for unlawful possession of a firearm, but he did not use the firearm in a violent manner or otherwise commit violent crimes.").

Here, these well-established principles support Magistrate Judge Faruqui's order of release. Weslee did not possess the instant firearm in connection with any drug trafficking offenses or violent crimes. It was not brandished or used. It was found during a traffic stop for equipment violations, not a violent incident. Weslee cooperated fully with officers and made no threats or evasive movements. The government mentions an open container, but it does not claim Weslee was intoxicated or impaired. Weslee himself has no history of violence and exhibits a responsible character as a father, sibling, and community member. There are thus no aggravating factors other than the mere possession of a firearm, which is not an "inherent…risk of violence warranting pretrial detention." *Singleton*, 182 F.3d at 14–15.

The government's reliance on Weslee's prior CPWL conviction is similarly misplaced. That offense occurred when he was 18 years old—too young to obtain a firearm license in D.C.—

and involved no violence. Indeed, it arose when he attempted to defend his neighbors from a violent attack. Treating that youthful act of defense of his family and neighbors as evidence of dangerousness turns the word on its head. As *Singleton* explained, "[t]he distinction between violent and non-violent felonies is . . . meaningful in the [bond] context," 182 F.3d at 15, and here Weslee's only criminal conviction is for the non-violent simple possession of a defensive weapon.

### III. Weight of the Evidence

In one sense, the evidence against Weslee is strong because the firearm was recovered from his person. But that hardly outweighs the other factors. As the Ninth Circuit has explained, "the weight of the evidence is the *least* important of the various factors." *United States v. Hir*, 517 F.3d 1081, 1090 (9th Cir. 2008) (quotation marks omitted) (emphasis added). That is because the Bail Reform Act "neither requires nor permits a pretrial determination that the person is guilty." *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985). Rather, "[t]hese factors may be considered only in terms of the likelihood that the person will fail to appear or will pose a danger to any person or to the community." *Id*. Otherwise, "the refusal to grant release could become in substance a matter of punishment." *Id*. Since all other factors favor release, this least significant factor should not prevent Weslee from resuming his important role as a father while he discusses the case with counsel and determines his legal options.

Moreover, the likelihood of conviction is significantly undermined in this case by substantial constitutional challenges. After the Supreme Court clarified its Second Amendment framework in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), a circuit split has developed regarding whether § 922(g)(1) can constitutionally be used to disarm nonviolent felons. *Compare United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023) (upholding the statute's constitutionality as applied to a defendant convicted of state law felonies for selling controlled

9

substances) *and United States v. Dunn*, 76 F.4th 1062, 1068 (8th Cir. 2023) ("Following [*Bruen*], this court concluded that the felon-in-possession statute is constitutional, and there is 'no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1).'") (quoting *Jackson*, 69 F.4th at 502), *with Range v. Att'y Gen. United States of Am.*, 124 F.4th 218, 231–32 (3d Cir. 2024) (en banc) (finding that the Nation's history and tradition of firearm regulation could not support disarming a defendant convicted of making a false statement to obtain food stamps). Just two weeks ago, a district court in Illinois weighed in on the side of holding as unconstitutional the disarming nonviolent felons under the Nation's history and traditions. *United States v. Glass*, No. 24-CR-30124-SMY, 2025 WL 2771011, at *5 (S.D. Ill. Sept. 29, 2025). This case raises the same question.

Moreover, the constitutional issue here is especially sharp, because the predicate felony for permanently disarming Weslee was *itself* the nonviolent charge of possessing a firearm without a license under constitutionally-suspect conditions. Specifically, at the time of the Weslee's prior conviction, his age (18) made it impossible for him to apply for a firearm license, despite his urgent need to protect himself, his family, and his home from the regular threat of firearm violence. And as courts are starting to recognize, laws restricting 18-20 year olds from obtaining a firearm permit when they are needed for self-defense are themselves likely unconstitutional. *See, e.g.*, *Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 127 F.4th 583, 600 (5th Cir. 2025) ("[T]he text of the Second Amendment includes eighteen-to-twenty-year-old individuals among 'the people' whose right to keep and bear arms is protected."); *Lara v. Comm'r Pennsylvania State Police*, 125 F.4th 428, 446 (3d Cir. 2025) (issuing injunction "forbidding the Commissioner from arresting law-abiding 18-to-20-year-olds who openly carry firearms during a state of emergency declared by the Commonwealth"). Since the validity of the charging statute (§ 922(g)) is in doubt, and the

prior predicate felony itself was for the nonviolent possession of a firearm under constitutionally-suspect conditions, the government cannot claim that conviction is inevitable. This factor is thus ultimately unimportant and a wash.

### IV.     Danger to the Community

Finally, there is no evidence that Weslee is a danger to the community. He is a loving partner and father who supports his family, contributes to his community, and has community and family support. Although he carried a firearm after witnessing a shootout and being shot personally as a passerby in a violent D.C. neighborhood, it was for self-defense. He has never been convicted of selling drugs, robbing others, or any similar conduct. Indeed, Weslee is an asset to the community, as Mr. Allen's letter and the letters of his family and neighbors show.

The government nevertheless insists that Weslee poses an unmitigated risk to the community because he "once again unlawfully possesse[d] a weapon—despite the incentive to learn from his prior encounters with the criminal justice system." Mot. at 6. But Weslee's decision to possess a firearm again despite the risks shows the dangerousness of his *environment*, not of himself. Having seen a peaceful neighborhood cookout get lit up by firearms, and having personally been shot once, Weslee understandably felt the need to stay alive was more pressing than the theoretical risk of legal consequences. While it was the wrong approach, nothing in that choice indicates that Weslee—the dedicated father, son, sibling, worker, and community mentor—is a danger to his community. Nor does repetition of a nonviolent felony transform it into a violent one. The government's boot-strapping theory of the inherent dangerousness of gun possession has been rejected by *Singleton* and numerous other courts in the bond context, as discussed above. This factor favors release.

## CONCLUSION

Weslee Wilkinson is a young father, a provider, and a man striving to do right by his family and community. He has no history of violence and no pattern of dangerous behavior. Magistrate Judge Faruqui correctly determined that home incarceration, GPS monitoring, and custodial supervision were sufficient to mitigate any risk. Since his release, there have been no violations or concerning incidents. The government presents no new information to suggest otherwise. To revoke release based solely on generalized fears about firearms would contradict the fundamental principle that liberty, not detention, is the norm. For these reasons, and those set forth above, the Court should deny the Government's motion and affirm the order of release.

Dated: October 14, 2025

Respectfully submitted,

_/s/ Matthew J. Peed_
Matthew J. Peed (DC Bar No. 503328)
matt@clintonpeed.com
**CLINTON & PEED**
1775 I St. NW, Suite 1150
Washington, DC  20006
Tel: (202) 919-9491

*Attorney for Weslee Wilkinson*